Commonwealth *v.* Bechtel, Appellant.

Argued November 25, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Albert Blumberg,* for appellant.

*John R. Graham,* Assistant District Attorney, with him *Raymond R. Start,* District Attorney and *Joseph E. Pappano,* First Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, February 6, 1956:

Robert B. Bechtel, a student at Swarthmore College, was arrested on January 11, 1955, charged with the homicide of Francis Holmes Strozier, a fellow student. While awaiting indictment and trial he filed an application for a Commission under §344 of The Mental Health Act of June 12, 1951, P. L. 533, 50 PS 1224. The Court thereupon appointed a Commission composed of Dr. George Wilson, Dr. Harvey Bartle, Jr., and Charles H. Heidmann. The Commission held hearings on March 8 and March 11, 1955. On March 9, 1955, the Grand Jury returned bills of indictment charging defendant with murder and manslaughter.

The Commission found that Bechtel was mentally ill and was a person of criminal tendency as defined in §102 of the Mental Health Act, sub-section (4) which reads: " 'criminal tendency' shall mean *a tendency to repeat offenses against the law or to perpetrate new offenses,* as shown by repeated convictions for such offenses or tendency to habitual delinquency". The Commission recommended that defendant be committed to Farview State Hospital for the remainder of his life. The Court made an order directing the commitment of the defendant to Farview State Hospital for treatment as a mentally ill person until the further order of the Court, pursuant to §1225(d) of the Mental Health Act.

Farview State Hospital is an institution for patients convicted of crime or a person who is charged with crime and has criminal tendencies, or a person who has criminal tendencies. From this order of the court Bechtel took this appeal.

Bechtel argues (1) that the Commission had no power or authority to state or recommend that he should be committed to a hospital for the criminal insane for the remainder of his life; and (2) there was no adequate evidence that he was "a person of criminal tendency".

Defendant does not question the finding of the Commission or of the Court that he "is in fact mentally ill and is in such condition to make it necessary that he be cared for in a hospital for mental illnesses" but objects, we repeat, to being committed to Farview State Hospital.

Under the Mental Health Act if a Sanity Commission is appointed, its findings are advisory and not mandatory upon the Court below; it is the Court and not the Sanity Commission which must be satisfied that the person charged with the crime is insane or mentally ill: *Commonwealth v. Patskin,* 375 Pa. 368, 100 A. 2d 472.

The Commission correctly decided that their duty was to ascertain and determine whether Bechtel was mentally ill *at the time of the hearing,* rather than at the time of the crime.

Bechtel shot a fellow student who was asleep in bed at approximately 3 a.m. If there were no other evidence, this one criminal act would not show him to be a man of criminal tendencies, but it is clear as crystal from Bechtel's own testimony that he should be placed in an institution for the mentally ill with criminal tendencies.

Bechtel informed the Commission that when he was in high school in Arizona he entertained thoughts of killing a boy who had threatened his life because "it was either he or I". During his junior year at Hill School he was sent to Norristown State Hospital for a short time. After 43 days in the Air Force he was given a medical discharge, the diagnosis being anxiety reaction, schizoid personality, paranoid personality, paranoid delusions. While he was in the Air Force he attacked another boy, believing, without reason, that the boy had stolen some of his records. He was in constant quarrels with the boys in his dormitory at Swarthmore College. He was so upset he decided to go home. On the way home he saw a sign "Norristown" and conceived the idea of going there and asking that he be locked up, but then gave up the idea. When he arrived home he was disappointed at not receiving from his mother proper consolation. He then took some books and 2 of his 5 guns and went back to his room at College, arriving there about 3 o'clock in the morning.

The Commission made, inter alia, the following findings from Bechtel's own testimony: "About half way back to College he decided to wipe out the 120 students in the dormitory, first thinking of using dynamite. After deciding on using the guns he intended to methodically take each room and shoot the boys. He went down the hall and saw a sign, . . . and thought he heard whispering in that room, so he went in the room and shot the boy. He was not sure who he was shooting . . . Then he fired three shots in the hall on the third floor, went down to the second floor and fired two more in the hall there, and finally fired a shot on the first floor . . . He stated that he has no feelings about the killing, feels no remorse, and is neither sorry or glad he did it. He could see no difference between war

and his action . . . The prisoner claimed his first sexual experience with a girl was when he was three years old; that he had another experience at four or five years of age; and has had sexual experience with some eight or ten girls since becoming an adult. . . . Based on the foregoing it is our opinion that this man is psychotic, with a diagnosis of paranoid schizophrenia (dementia praecox) . . . He probably has experienced hallucinations . . . He is delusional . . . His statement that dynamiting the dormitory would have been the 'most efficient' way of handling the matter, together with his walking down the hall with a rifle in his hands, a revolver, a hunting knife, flashlight and cartridge belt strapped to him, show his great defect in judgment and his complete lack of understanding of human problems and their solution. . . . During the examination . . . he was hostile toward the examiners and others in the room . . . His prognosis is extremely bad in view of the long history, and he will remain a potentially dangerous person."

One of the two major reasons for the Mental Health Act was to protect society from those who are mentally ill and have criminal tendencies. Bechtel certainly comes squarely within these provisions of the Act.

Defendant, being dissatisfied with the findings of a Commission which he petitioned the Court to appoint to determine his mental illness and with the Court's action in connection therewith, now contends that he was unlawfully deprived of his Constitutional right to a trial by jury. There is no merit in this contention.

Article 1, §6 of the Constitution provides: "Trial by jury shall be as heretofore, and the right thereof remains inviolate." Article 1, §9, upon which defendant mainly relies, provides: "In all criminal prosecutions the accused hath a right . . . and, in prosecutions by

indictment . . . a speedy public trial by an impartial jury."

The Answer to Article 1, §6 is clear. No right to a trial by jury ever existed prior to the adoption of the Constitution in the case of an inquiry by a Commission or by a Court as to the mental illness of a person or whether he has criminal tendencies. Cf. *Watson Appeal*, 377 Pa. 495, 105 A. 2d 576. It is important to recall that the present proceeding is under the Mental Health Act of 1951 which was an amendment, revision and consolidation of the laws relating to Mental Health first enacted July 11, 1923, P. L. 998. Constitutional guarantee of trial by jury does not prevent the legislature (a) from creating or providing modes or tribunals other than a jury trial for the determination or adjustment of rights and liabilities which had not been triable by jury prior to the Constitution: *Premier C. & B. Co. v. Pa. Alcohol P. B.*, 292 Pa. 127, 133, 140 A. 858; *Commonwealth v. Jackson*, 345 Pa. 456, 28 A. 2d 894; *Watson Appeal*, 377 Pa., supra; or (b) from creating new offenses and "prescribing what mode they please of ascertaining the guilt of those who are charged with it": *Van Swartow v. Commonwealth*, 24 Pa. 131, 134.

This petition for a commission to determine petitioner's mental health and the proceedings thereunder is not a criminal prosecution but a collateral proceeding to determine the mental health of the person involved for his benefit or for the benefit of the public or both. Cf. *Com. v. Patskin*, 375 Pa. 368, 100 A. 2d 472; *Com. v. Iacobino*, 319 Pa. 65, 178 A. 823; *Com. v. Scovern*, 292 Pa. 26, 140 A. 611. Inquiries into the mental health or sanity of a prisoner whether made before trial or after conviction and before sentence are "to inform the conscience of the judge". *Com. v. Iaco-*

*bino,* 319 Pa., supra; *Com. v. Scovern,* 292 Pa., supra. Where an inquiry is made into the mental illness or sanity of a defendant the purpose of which is solely to inform the conscience of the Court, the accused does not have under the Constitution a right to a trial of such issue by a jury. Cf. *Com. v. Iacobino,* 319 Pa., supra; *Com. v. Patskin,* 375 Pa., supra.

The order of the Court below is affirmed.

———

OPINION BY MR. JUSTICE MUSMANNO CONCURRING AND DISSENTING IN PART:

There is no doubt that the appellant, Robert B. Bechtel, is mentally ill and that for his own benefit and for the protection of society he should be confined, but there is no warrant under the law for committing him to an institution for the criminal insane. The appellant is under indictment for murder but he has not yet been tried, and under the Constitution and the law of the land, he is entitled to a trial if and when he should regain sanity. Nor can it be said that he will never recover equilibrium of the mind. The advances made in medicine in recent times lend encouragement to the hope that those upon whom has descended the tragic blindness of insanity will yet see again. Many an affliction which down through the centuries bore the dread label of incurable has fallen under the magic wand of science and no longer frightens mankind. Diseases which have struck terror not only to individuals but to entire communities, vast geographical expanses, and even entire races, are now mere exhibits of curiosity in medical museums.

However, aside from the humanitarian aspect of this observation, the lower Court, in my opinion, overstepped the bounds of the statute under which it acted,

in consigning the appellant to the horrors of a criminally insane hospital, when there are other hospitals equipped to take care of the prisoner and where, in his climb back to mental health, he would not be burdened with the additionally crushing weight of an adjudication of criminal insanity. Although it is true that the lower Court left unlocked a possible door of release by stating that the prisoner was committed to Farview until "further order of the Court," it applied at the same time a rather heavy padlock on that door by approving without limitation the report of the Sanity Commission which categorically directed life institutionalization. Appellant's counsel argues justly in his brief when he says in this connection: "From a practical standpoint, it must be recognized that some day someone in authority will have to make an administrative or judicial determination as to whether the appellant is 'sufficiently improved' to be remanded for trial. The appellant has the right to have such determination made upon the facts as may then exist without being prejudiced by the anticipatory disapproval of the commission and of the court below."

For reasons which are not only humane but therapeutically objective, the law of our State distinguishes between hospitals for the generally mentally ill and a "State hospital for patients convicted of crime, charged with crime, or with criminal tendencies." Upon a study of the record I do not see why the appellant, instead of being committed to the Norristown State Hospital where the horizon of cure is always in view, has been consigned to Farview where recovery is an ever-receding Fata Morgana on the bleak desert of despair.

I particularly dissent from that part of the Majority's Opinion which treats of the defendant's right before the Sanity Commission. The Majority Opinion says that the defendant is not entitled to a jury trial

under the Mental Health Act of 1931. I have no quarrel with that conclusion. However, the Opinion of the lower Court justifying the decision which this Court affirms goes further than merely stating that a jury trial is not called for. It says that the defendant in these proceedings "has no constitutional right to be confronted by or to cross-examine witnesses." This in effect means that he may not be represented by counsel because it is counsel that cross-examines witnesses. If the Constitution guarantees the right of counsel to every person accused of crime, with what greater force should that guarantee apply to one who has at stake not only his liberty but what is far more precious than liberty or life itself, namely, the very kingdom of understanding.

No one can deny that untruthful witnesses can and sometimes do appear in all types of proceedings. It is illogical, to say nothing of unjust, to hold that if the result of the proceeding be merely a man's commitment to prison, the accusing dishonest witnesses may, through the engine of cross-examination, be exposed, but if the commitment is to be to the horrors of an insane asylum, the detained person and his attorney may not, through the x-ray of cross-examination, reveal the falseness of the accusation.

The Majority says that the "inquiries into the mental health or sanity of a prisoner . . . are to inform the conscience of the judge." I fail to see how the full participation in an inquiry by a member of the bar may impede the functioning of the conscience of the Court. On the contrary, an attorney's participation would considerably assist in the process of informing the conscience of the Court. More familiar as he would be than the Court with the background, history, traits and general health of the subject, the attorney's probing, questioning and cross-questioning would be in-

194

valuable in the ascertainment of truth and in the attainment of justice, the only purpose of any legal proceeding or life itself.